# Commonwealth of Pennsylvania ex rel. Clarence M. Busch, Appellant, *v.* Thomas M. Jones, Superintendent of Public Printing.

*Public printing—Superintendent of public printing—Secretary of agriculture—Act of May 1, 1876, article 3, section 12 of the constitution—Mandamus.*

The public printer is a mere contractor, subject to the direction of the superintendent of printing, and bound by his contract to obey the orders of that officer, and he is under no duty to inquire if an order addressed to him by the superintendent of printing is itself based upon a proper order from the head of the department for which the printing is to be done.

A resolution of the legislature approved by the governor directed the printing of 15,000 copies of a pamphlet previously issued by the department of agriculture, entitled, " ' The Diseases and Enemies of Poultry,' with such additional matter and changes as the authors may deem necessary to more fully explain this important subject." The authors, who were subordinate officials in the department of agriculture, added a large amount of matter, and sent the manuscript to the public printer with an order signed by them directing him to print it. The public printer sent the order to the superintendent of public printing, and shortly afterwards received an order from him directing him to print the book. No order was signed by the secretary of agriculture, and there was no evidence that the public printer knew on what order the superintendent of printing acted in directing him to print the bulletin. There was also no evidence of fraud or collusion. *Held,* that the public printer was entitled to a mandamus to enforce the payment of his claim.

Argued May 30, 1899. Appeal, No. 27, May T., 1899, by plaintiff, from order of C. P. Dauphin Co., Commonwealth Docket, 1898, No. 624, refusing mandamus. Before STERRETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ. Reversed.

Petition by the relator, contractor for the public printing and binding of the commonwealth, for a mandamus, directed to respondent, superintendent of public printing, commanding him to audit and certify a bill for publishing a pamphlet ordered by the general assembly.

The case came before the court of common pleas on the petition, answer and testimony. Most of the material facts appear by the opinion of the Supreme Court.

The opinion of McPHERSON, J., was in part as follows:
On April 6 the following paper was prepared:

"HARRISBURG, PA., April 6, 1897.
"Superintendent of Public Printing and Binding:
"Furnish the following as per resolution approved March 9, 1897, relative to Bulletin No. 17, on Diseases and Enemies of Poultry, etc. Make type pages smaller and double leaded as directed; special paper cover, uncut edges, and illustrated as directed by the authors.

"LEONARD PEARSON,
"State Veterinarian.
"B. H. WARREN,
"Economic Zoölogist."

This paper was delivered by Dr. Warren to Mr. Busch, and by Mr. Busch to the superintendent of public printing, who afterwards signed the following order:

"HARRISBURG, PA., April 12, 1877.
"CLARENCE M. BUSCH, State Printer:
"You will furnish the following for the use of the Agricultural Department, and charge the same to the Commonwealth in the general account for public printing and binding.

"THOMAS ROBINSON,
"Superintendent Public Printing and Binding.
"As per resolution approved March 9, 1897, relating to Bulletin No. 17, on Diseases and Enemies of Poultry, etc. Make type pages smaller and double lead as directed; special paper cover, uncut edges, and illustrated as directed by the authors."

5. No manuscript or other material for the reprint was furnished by Messrs. Warren and Pearson to the superintendent, but all material went directly into the hands of Mr. Busch, and the proof was returned for correction to the authors, and not to the superintendent. The only new material furnished by Dr. Pearson was two water colors, of which plates were prepared and used; the rest of the voluminous additions to the original pamphlet was prepared or compiled by Dr. Warren. He ordered the numerous illustrations, and bestowed much labor and attention upon this feature of the volume. The illustrations are mainly colored lithographs, prepared and

printed by a firm in Rochester, New York. The stones upon which the work was done were not delivered to the commonwealth, but remained with the firm and have probably been ground off and used for other printing. The impressions were made by machine, not by hand-press work. The size of the printed page does not correspond with the size prescribed in section 19 of the act of 1876. The page there prescribed contains about 1,900 ems, while the page in the reprint contains only about 1,200 ems. The relator contends that the superintendent was empowered to make this change, but no provision of the statute was pointed out that sustains the contention. Section 20 permits the executive and heads of departments to exercise a reasonable discretion as to the style of execution, but the superintendent is not named in this grant of power.

6. The number of pages in the original pamphlet is 128, and it contains thirty-five black and white illustrations, most of them being small. The reprint contains 866 printed pages, and has 103 additional illustrations, of which ninety-five are full page colored lithographs. The cost of 3,500 copies of the original pamphlet was $488.24. The bill now presented is for the sum of $55,662.85, of which $2,325.46 is for composition, press work, stitching, etc., while $53,337.39 is for the work done upon the illustrations.

A considerable part of the letter press, and a good many of the illustrations, in the additional matter, are not relevant to the subject, and should not have been allowed to appear in a book on the Diseases and Enemies of Poultry.

## DISCUSSION.

The writ of mandamus can only be used to enforce a clear legal right, for which there is no other adequate remedy. We hesitate to say, that the relator has shown such a right, and upon this ground alone we might refuse relief. If one considers the positive commands of the act of 1876 concerning the method of ordering the work to be done by the state printer, and also concerning the method of doing the work, and if it is then observed that these commands were either disregarded or disobeyed by the relator in several particulars, his right to mandamus can hardly be described as clear. He violated the letter of the statute in several respects; and while it is only fair

to add that the excuses for some of these violations may perhaps be equitably sufficient, nevertheless the excuses appeal rather to one's sense of fairness than to the relator's legal right under the strict terms of the law. We pass this point, however, for there is another position that seems to us to be decisive of the controversy ; and, if we are correct in the view we take of the matter, the relator has no legal right, doubtful or otherwise, to the money now claimed. Section 20 of the act of 1876 expressly provides "that the superintendent of public printing and binding shall receive no order for the printing and binding of any papers, documents, blanks or miscellaneous work, unless the same be in writing, signed by the Executive or head of the proper department; the order shall contain a particular description of the work and material, and the provisions of this act shall embrace the chief clerks of the senate and house of representatives." It is clear from the foregoing findings that the so-called order to the superintendent of public printing, upon which this work was done, is drawn in distinct violation of this provision. The paper is not signed by the executive or by the head of any department, but by two subordinates ; and it does not contain a particular, but an obviously inadequate description of the work and material. It simply refers to the pamphlet that is to be reprinted with additions and changes, but does not specify what is to be added or changed. No addition or change is particularly described. The pages are to be " smaller," but the new size is not stated ; it is to be " as directed " by some person not named. The cover is to be " special," whatever that may mean ; and something (the grammatical connection is obscure), is to be " illustrated as directed by the authors." The changes and additions permitted by the legislature were in the matter of the pamphlet, but of these there is no indication whatever, except so far as the word " illustrated " may be taken to suggest, that prints of some kind are to be used. Not a page of manuscript, not a copy or a description, vague or precise, of a single proposed illustration, accompanied the paper ; and there is no particularity otherwise in describing the work that the authors had in view. It may not be necessary that the manuscript of a proposed change or addition should in all cases be prepared, or that the illustrations should be indicated by sketches or drawings, before the super-

intendent issues his order to the public printer; but, in the absence of the manuscript or of the drawings, it is more imperative that "a particular description of the work and material" should be furnished to the superintendent. He must have it before he can lawfully proceed. It is impossible to lay down rules for his guidance in determining when a description is sufficiently particular. It must be conceded that the situation may sometimes be delicate, requiring tact and good judgment; but he must obey the law, and must guard the interests committed to his care, even if friction and difficulty do occasionally arise. It is a violation of the statute to dispense with the positive command that a particular description shall be contained in the order, and in this instance the law was violated.

There is force in the relator's contention that he was not bound to inquire what kind of order came into the hands of the superintendent of public printing, and that the public printer's concern is simply with the orders that he may receive from the superintendent. It was no part of his duty, he avers, to see that the law was complied with by the persons that gave orders to the superintendent; neither was he bound to exercise a censorship over the manuscript that came into his own hands, and to decide whether it contained irrelevant matter, or was too profusely or too expensively illustrated. We are disposed to agree with this position. If the printer does not know the contents of an order lodged with the superintendent, he is not bound to inquire; the difficulty here is, that the relator had knowledge of the particular paper now being considered. It was delivered to him, and he knew that it was signed, not by the head of a department, as required by the act, but by two subordinates, who had no legal power to bind the state by such a paper. He must have known also that it contained no particular description of additions and changes, and he cannot escape the consequences of his knowledge upon these two points. He was bound to take note of the commands of the statute, and, so far as he knew that these commands were being disobeyed, it was his duty to refuse compliance. This is the fundamental defect in his case, and it is not cured by the fact that he received afterwards a formal order from the superintendent, based upon the illegal paper and merely repeating its contents.

It may be seriously questioned also whether the formal order

to the relator, signed by the superintendent, did not, upon its face, show that it, too, was not in compliance with the law. The order was not accompanied by the material which the printer was to reproduce, and while (as has been already said) this may not be always necessary, and may sometimes be impossible, it is certainly a desirable practice. Here there was not a line of manuscript, and no indication whatever of the number and character of the illustrations that were to appear in the reprint; but the whole matter was turned over by the superintendent to the authors, mainly to Dr. Warren, who was allowed to do exactly as he pleased. Whatever may be meant by "a particular description of the work and material," which the act requires the order to contain, it certainly does not mean that the superintendent may abdicate his functions entirely, and give unchecked discretion to another person. The superintendent must retain control of the transaction, and to this end both manuscript and proof should at least pass through his hands, so that he may know what is being done. Evidence was offered at the trial— and we find the fact to be—that in numerous instances no such practice was followed, but important and expensive books were printed without the slightest supervision by the very officer appointed to exercise control. If this has grown to be a custom, it is an evil custom, contrary to the statute, and should be abolished. It cannot justify one more illegal act.

The result of such surrender of the superintendent's right of control is vividly illustrated in the case before us. Here is a book, beginning in a small pamphlet on "The Diseases and Enemies of Poultry," but now enlarged into a portly volume, profusely illustrated and full of irrelevant matter. No doubt the legislature used a loose phrase when it authorized such additions and changes "as the authors may deem necessary;" but they made their meaning sufficiently clear by adding immediately, "in order to more fully explain this important subject." It is difficult to understand how the "enemies of poultry" in Pennsylvania can be made to include the buzzard, which Dr. Warren assures us "does not, as some persons affirm, disturb domestic fowls, and rarely . . . . destroys the eggs of poultry;" or the Mississippi kite, of which only one specimen has ever been found in the state, and which "does not visit the poultry yard;" or the swallow-tailed kite, which "feeds principally on grasshop-

pers, beetles, caterpillars, small snakes, lizards and frogs," and "never was known to disturb poultry." The fish hawk finds a place also, although the author's opinion is, that "these birds never touch other food unless they are unable to catch fish . . . . (and) do not, as some farmers believe, disturb domestic fowls; " and room, too, is made for the barn owl, although it "never commits depredations in the poultry yard," and for the long-eared owl, although it "never disturbs domestic fowls." These are only samples. The curious will find superfluous information about the blue jay, the shrike, the blackbird and several aquatic birds of the heron family. There are paragraphs about the objectionable habits of the English sparrow, the increase of rabbits in Australia, and the fashion of wearing the plumage of song birds in the head-dress of women. The hibernation of certain mammals receives some attention, while several pages are devoted to the extermination of the bison, the elk, the beaver and the wolf, and the disappearance of the wild pigeon. Rabbits are not usually classed among the enemies of poultry, but they take up two pages of this volume, sandwiched between the squirrel and the fox. There is a vivacious description of a coon hunt, and this part of the volume closes with twenty-six pages of what may be called a sportsman's guide to various sections of the state, describing the various haunts of game birds and fishes, and containing some reference to the hotel and railroad accommodations that may be expected. Some of the illustrations exhibit a like irrelevancy, although the examples are not so numerous. One print is à typical example of the scenery along the Susquehanna river, followed by an excellent impression showing the Lewistown Narrows on the Pennsylvania railroad. A scene along an unnamed stream in the mountains probably finds the reason for its existence in the title, "Where Foxes Rove," but one is at a loss to imagine why the picture of a trout fisher absorbed in the possibilities of an inviting rapid on Penn's creek, should have adorned the pages of a book on the Diseases and Enemies of Poultry.

There is other desultory and inappropriate matter in the book, but enough has been cited to show that the surrender of the superintendent's power of control led to a flagrant abuse. The instance is conspicuous enough to exhibit with clearness the possible consequences of relaxing the statutory supervision, and

it is for this reason alone that we have referred to some parts of the book. But we do not put the decision in any measure upon the contents of the volume. We rest it wholly upon the facts that the original paper signed by Messrs. Warren and Pearson did not comply with the act of 1876, and that the relator knew (or must be held to have known), that the paper was thus defective. If he has any claim to be paid for this work, he must address himself to the legislature and not to the courts. Of legal right, we think this case is barren ; whether he has a moral or equitable claim to the consideration of the commonwealth, is not within our province to decide.

Without prolonging the discussion, we conclude that the relator has no legal claim to be paid the account in question, and we therefore direct the prothonotary to enter a decree refusing the mandamus, and awarding costs to the defendant.

*Error assigned* was refusal for mandamus.

*H. F. Walton* and *W. U. Hensel,* for appellant.—Mandamus is the proper remedy : Com. v. Thompson, 86 Pa. 443 ; Rex v. Barker, 3 Burrows, 1265 ; Com. v. Mann, 5 W. & S. 403 ; Phila. v. Commissioners, 3 Brewster, 333 ; Com. v. Dickinson, 3 Brewster, 561 ; Com. v. Bunn, 71 Pa. 405 ; Com. v. Gregg, 161 Pa. 582.

There is no merit whatever in the commonwealth's contention here. Its legislative branch of government ordered and its executive approved the work. It was sent to the superintendent of public printing by the authors, exactly as the general assembly directed. It was ordered by the superintendent just as all other work has been ordered for years. The paper for it was supplied by the commonwealth. It was executed in conformity with the contract. No fault is found with the mechanical features of the work. It was charged for strictly at the contract price. No exception is taken to a single item of the bill. To strike down a just bill of $55,000 because the order for the work came from those into whose hands the legislature placed it, instead of another official, who was sick, and 2,000 miles distant, and whose order and action in the premises could not have been other than the legislature has directed, would be not only inequitable and unjust, but it would be absurd. The judgment should be reversed and the mandamus ought to issue.

*John P. Elkin,* attorney general, with him *Frederick W. Fleitz,* deputy attorney general, for appellee.—The evidence shows that the petitioner proceeded in entire disregard of almost all the provisions of the act of assembly relating to public printing and binding; that he acted without legal authority; that he ignored the plain mandate of the resolution which authorized the republication of bulletin No. 17; that, while he had printed the original pamphlet at a cost of $488.24, he prepared the new book without consultation with the head of the department whose duty it was to issue the order for the republication of the original pamphlet, and added many hundred pages of new matter, and almost a hundred illustrations, without notice to the superintendent of public printing and binding, and now seeks to charge the state with a total cost of $57,666.85, without legal warrant for so doing. The court below has refused to aid the appellant in his effort to secure this large sum of money from the commonwealth, and it is respectfully submitted that this Court should sustain the position so ably stated by the court below.

OPINION BY MR. JUSTICE FELL, July 19, 1899:

The Act of May 1, 1876, P. L. 68, was passed to carry into effect the provisions of section 12 of article 3 of the constitution in relation to public printing. The method provided by the act, so far as it need be considered in this case, is briefly this: every four years the secretary of the commonwealth receives proposals for executing the public printing, and allots the printing to the lowest bidder; the governor appoints a superintendent of public printing, whose duty it is to receive and take charge of all reports made by heads of departments to the governor, and to have them printed, and to arrange and supervise the printing of all matter ordered by the legislature to be printed. The superintendent of public printing is the head of a department, and he has the entire supervision of the work done by the public printer, who is a contractor merely. He is given the power, if the public printer fails in any respect to comply with the terms of his contract, to employ another printer to do the work, and to charge the excess of cost to the contractor.

The 20th section of the act provides that no printing, except

laws, journals of the houses, the volumes of legislative and executive departments and the reports of the heads of executive departments, shall be printed by the public printer unless previously ordered or authorized in writing by the superintendent of public printing, and that no book shall be published at the expense of the state, or additional copies of any book be furnished by the public printer, unless by virtue of express authority of law. The executive and the heads of departments are permitted to exercise a reasonable discretion as to the style of printing ordered, and the superintendent of public printing is directed to receive no order for printing " unless the same shall be in writing and signed by the executive or the head of the proper department; the order shall contain a particular description of the work and material, and the provisions of this act shall embrace the chief clerk of the senate and house of representatives. '

In 1896 two officers of the department of agriculture, Dr Pearson, state veterinarian, and Dr. Warren, economic zoölogist, prepared a pamphlet known as Bulletin No. 17, relating to " The Diseases and Enemies of Poultry." Thirty-five hundred copies of this pamphlet were printed at the expense of the state and issued by the department of agriculture. The edition was soon exhausted, and there were numerous demands for additional copies. In transmitting the bulletin it was stated that the state zoölogist had in the course of preparation additional matter, and in a few months would be able to prepare a report which would " show the true life history of the birds and mammals of which, at the present time, so many diverse opinions are entertained." Attention was called to the fact that the value of poultry and eggs annually produced in the state amounts to $22,000,000, and that the loss to the industry by disease and predatory animals amounts to $2,500,000 annually, and that there was a widespread demand for information on the subjects treated of in the bulletin; and it was stated that if authority were given to prepare documents on different topics of natural history they would be " embellished with numerous illustrations."

With this knowledge and these recommendations before it, the legislature, with the approval of the governor, directed the printing of 15,000 copies of Bulletin No. 17, with such additional matter and changes as the author might deem neces-

sary, the form of the resolution being : " Resolved, (if the senate concur) that there shall be printed at the earliest possible date, in pamphlet form, fifteen thousand copies of Bulletin No. 17 of the Department of Agriculture, entitled, ' The Diseases and Enemies of Poultry,' with such additional matter and changes as the authors may deem necessary to more fully explain this important subject," etc.

On the 12th of April, 1897, the state printer received from the superintendent of public printing the following order :

" You will furnish the following for the use of the agricultural department, and charge the same to the commonwealth in the general account for public printing and binding.

"THOMAS ROBINSON,

"Superintendent Public Printing and Binding."

" As per resolution approved March 9, 1897, relating to Bulletin No. 17 on Diseases and Enemies of Poultry, etc. Make type pages smaller and double lead as directed; special cover, and illustrated as directed by the authors."

In pursuance of this order 15,000 copies of the bulletin were printed. The changes and additional matter enlarged the original publication from 128 to 366 pages, and the reprint contains 103 additional illustrations. It is not disputed that the work was properly done, or that the prices charged are in strict conformity with the contract. The mandamus was refused on the ground that no order for the printing had been given to the superintendent of public printing, either by the chief clerks of the two houses, as required when printing is done for the senate or the house of representatives, or by the secretary of agriculture, as required when printing is done for that department, and that of this fact the printer had knowledge. The ground for imputing knowledge to the public printer that the superintendent of public printing had not been properly authorized to issue the order of April 12 is that on April 6, six days before the date of that order, an order for the printing of the bulletin signed by Dr. Pearson and Dr. Warren, had been sent him. He did not act on this order, but took or sent it to the department of public printing and received the proper order, on which he did act, from the head of that department. The decision is based wholly upon the facts that the order of April 6,

signed by Drs. Pearson and Warren, did not comply with the act of 1876, and that the relator knew, or must be held to have known, that the paper was thus defective.

There is no evidence that the relator knew on what order the superintendent of printing acted in directing him to print the bulletin.   We have the bare facts that the relator received the order signed by Drs. Pearson and Warren; that, as it was an order from a department with which he had no relation, and which was not authorized to order him to do any printing, he declined to act upon it; that he sent the order to the department of public printing, and in the regular course of business received from that department an order which was in all respects regular and complete, and under which he did the work. In these facts we find no ground for the conclusion that the relator knew, or must be held to have known, that the order which he received from the department of printing was founded on a defective order from another department.  As before stated, the public printer is a contractor, subject to the direction of the superintendent of printing, and bound by his contract to obey the orders of that officer.   He cannot be held to the knowledge that a state officer, the head of a department authorized to order him to do certain work, has himself been properly authorized by another department to issue the order, and he is under no duty to inquire.   In such matters there must be a beginning and an end to responsibility.   His duty was that of obedience to the orders of the superintendent of public printing in all matters provided for by his contract.   The fact that he received the order from Drs. Pearson and Warren, and sent it to the department of printing, is not ground for the assumption that he knew that that department had acted on a defective order in issuing an order to him.   The presumption is in favor of the regularity of official conduct, and he might well have assumed that the superintendent of public printing had procured, as he should have done, an order signed by the superintendent of agriculture before directing the work to be done.

If there had been fraud or collusion the case would be different, but there is not the slightest evidence or even suggestion of either.   The only irregularity was that the order to the department of printing was not signed by the chief of the department of agriculture, but by his subordinates.   Of this fact we

do not find that the relator had actual knowledge, or that there is ground for imputing knowledge to him. The legislature ordered the printing to be done. It was done in a satisfactory manner, and apparently, as far as the relator was concerned, in the regular and orderly course of business. The commonwealth got what it had ordered. If the cost was unduly increased, it was because unlimited discretion was given to the authors to make changes and additions. The consequences of such loose and inconsiderate legislation should rest where they belong, and not be visited upon a contractor who appears to have acted faithfully.

The decree is reversed with costs, and it is ordered that a peremptory mandamus be issued.